UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ANTHONY E. BARNES,

        Plaintiff,

   v.                              Case No. 23-cv-1102-bhl

LORIJEAN WACHHOLZ, et al.,

        Defendants.

## DECISION AND ORDER

    Plaintiff Anthony Barnes, an inmate at Oshkosh Correctional Institution, is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims in connection with Defendants' alleged deliberate indifference to his complaints of knee pain. On July 8, 2024, Defendants moved for summary judgment. For the reasons explained below, the Court will grant the motion and dismiss this case.

## BACKGROUND

    At the relevant time, Barnes was incarcerated at Green Bay Correctional Institution, where Defendant Hannah Utter worked as the health services unit manager and Defendant Lori Wachholz worked as an advanced practice nurse prescriber. Barnes was first seen by Wachholz on January 3, 2022, for complaints of a rash. She was first apprised of Barnes' knee pain on February 15, 2022, at which time Barnes refused to be examined by a nurse. Following a consultation with the nurse, Wachholz approved referring Barnes to physical therapy. At the time, the institution had only one part-time physical therapist who worked two days per week, resulting in a significant backlog. Inmates generally had to wait about six months after a referral to see the physical therapist. Dkt. Nos. 43, 48 at ¶¶1-3, 36-39.

On April 18, 2022, Barnes submitted a request to the health services unit, in which he stated that he had been experiencing knee pain since 2018 and that the health services unit had been giving him the runaround. He asked for an x-ray. Even though the request was addressed to Utter, per policy, a nurse (not a Defendant) triaged the request and responded that referrals to an advance care provider and to physical therapy were in place, pending scheduling. Because the nurse responded to the request, it was not forwarded to Utter. Dkt. Nos. 43, 48 at ¶¶15-18, 20-21.

The next day, on April 19, 2024, Barnes was seen by a nurse (not a Defendant) about his knee pain. Barnes reported that his knee hadn't bothered him during the COVID lockdown but had become more painful with more activity. Barnes denied any injury. The nurse provided him with an ACE wrap and placed a referral for him to see Wachholz. Dkt. Nos. 43, 48 at ¶¶40.

A couple of weeks later, on May 4, 2022, Barnes filed an inmate complaint about not receiving treatment for his knee pain. The institution complaint examiner (not a Defendant) contacted Utter for information. Utter reviewed Barnes' medical chart and noted that he had been examined by a nurse on April 19, 2022 and had been referred to his advance care provider. She also followed up with the physical therapist and requested that Barnes be scheduled within the next two weeks. The physical therapist informed Utter that Barnes was scheduled to be seen the following week. Utter updated the institution complaint examiner with this information. Dkt. Nos. 43, 48 at ¶¶23-28.

Barnes was seen by the physical therapist (not a Defendant) on May 9, 2022. He denied having injured his knee but noted that he had played football when he was younger, which may have resulted in trauma to his knee. The physical therapist found no sign of a specific tear, but noted that Barnes presented with decreased hip strength, which was impacting his lower extremity mechanics. The physical therapist started Barnes with manual therapy and gave him a home

exercise program to help increase mobility and strength and decrease pain. Barnes had a follow-up appointment on June 27, 2022, at which time he reported no pain while resting but discomfort of 3 to 4 out of 10 with activity. He explained that standing at work for long periods of time exacerbated his symptoms. The physical therapist again noted Barnes' hip weakness, which contributed to poor knee mechanics. He instructed Barnes to continue his home exercise program and gave him a theraband. The physical therapist intended to follow up with Barnes in 2 to 3 weeks, but this appointment did not occur. Dkt. Nos. 43, 48 at ¶¶41-44.

On August 29, 2022, Wachholz had a follow-up appointment with Barnes, at which time they discussed his knee pain. Wachholz noted that Barnes was overweight and suggested to him that one of the best ways to alleviate the pain would be to lessen the load on his knee by losing weight. They discussed lifestyle modifications, a healthy diet, increasing water intake, and exercise. They also discussed getting some lab tests to address his obesity, and Wachholz ordered lidocaine topical cream to help with the pain. Wachholz decided, given the infrequency and moderate intensity of Barnes' knee pain, a topical rather than oral analgesic was adequate. Wachholz explains that she did not order imaging such as an x-ray or MRI because Barnes had not reported a specific injury, he was being seen by physical therapy to address poor movement mechanics, and his complaints of mild pain did not indicate a severe underlying condition. Wachholz believed starting with conservative treatment options such as exercise and weight loss combined with physical therapy was appropriate. Dkt. Nos. 43, 48 at ¶¶45-49.

Barnes next saw the physical therapist on October 6, 2022, at which time he reported his knee pain had worsened. He explained he had been moved to the dorms and was unable to use his theraband or do the home exercise program. The physical therapist provided Barnes with ultrasound therapy and ensured he could perform his home exercise program in the dorms. Barnes

saw the physical therapist again about a month later, on November 17, 2022. Barnes reported that his knee pain was unchanged. The physical therapist suggested he continue with his home exercise program. Barnes agreed he could be discharged from physical therapy. He reported strength gains but no additional pain relief. The physical therapist suggested that Barnes speak to his advance care provider (Wachholz) about next steps. Dkt. Nos. 43, 48 at ¶¶50-54.

On February 2, 2023, Barnes missed a step while working and injured his left knee, which was slightly swollen. Barnes was given a knee sleeve, ice, crutches, and four days off of work. The next day, a sergeant called health services and reported that Barnes was walking without the crutches. A few days later, on February 6, 2023, a nurse saw Barnes, at which time he walked normally without any signs of distress. Barnes reported his knee felt better and was just a little stiff. He stated he was wearing the knee sleeve and could return to work the next day. Dkt. Nos. 43, 48 at ¶¶55-57.

A few days later, on February 9, 2023, Wachholz saw Barnes about complaints of shoulder pain. Barnes did not raise any concerns about knee pain. Wachholz placed an order for a follow up regarding his shoulder pain, obesity labs, and physical therapy sessions. About six weeks later, on March 23, 2023, Barnes again saw the physical therapist. He reported improvement in his symptoms and function, but he noted that he still had knee pain. Barnes stated that he continued to perform his home exercises and was able to perform his daily living, work, and leisure activities. The physical therapist officially discharged Barnes from physical therapy at this time. Dkt. Nos. 43, 48 at ¶¶58-60.

A few weeks later, on April 17, 2023, Wachholz met with Barnes to discuss a rash and his knee pain. At this appointment, Barnes noted that his knee pain had started in 2017. For the first time, he stated that he had been playing basketball one day and woke up feeling like something

4

wasn't right. He stated that his current pain was about 5 to 6 out of 10 and sometimes woke him up at night. He reported that lidocaine, which had previously helped, no longer worked. He also noted that the naproxen she had prescribed for his shoulder pain, did not provide relief for his knee pain. In response, Wachholz cancelled his prescription for naproxen and ordered acetaminophen. She also ordered an x-ray, which occurred a few days later, on April 20, 2023. The x-ray results were normal. About a week later, Wachholz ordered that staff complete a functional observation study of Barnes. A sergeant reported that Barnes did not have any limitations in his daily living activities, but he noted that he had not observed Barnes during recreation. Wachholz ordered a functional observation study of Barnes' movements during recreation, but this never occurred because Barnes was transferred to a different institution on May 3, 2023. Wachholz did not have any further involvement in Barnes' care after his transfer. Dkt. Nos. 43, 48 at ¶¶61-71.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly

5

entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Barnes asserts that Wachholz and Utter were deliberately indifferent to his knee pain. To prevail on a deliberate indifference claim under the Eighth Amendment, a plaintiff must prove that prison officials intentionally disregarded a known, objectively serious medical condition that posed an excessive risk to the plaintiff's health. *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (citations omitted). The Seventh Circuit has "found the following circumstances to be indications that a prisoner has a serious medical need: The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (citations and internal question marks omitted). Defendants assert that Barnes' knee pain was not sufficiently serious, but a jury could reasonably conclude that his chronic knee pain, which sometimes woke him up at night and for which he was prescribed physical therapy and pain medication, was an objectively serious medical condition. Accordingly, the Court's analysis will focus only on whether a jury could reasonably conclude that Defendants were deliberately indifferent to that condition.

1. **No jury could reasonably conclude that Wachholz was deliberately indifferent to Barnes' knee pain.**

When assessing whether a prison official acted with the requisite state of mind, courts must "examine the totality of an inmate's medical care." *Lockett v. Bonson*, 937 F.3d 1016, 1023

(7th Cir. 2019) (citations omitted).  The Seventh Circuit has made clear that, to establish the requisite mental state, "something more than negligence or even malpractice is required." *Id.*

Wachholz first learned about Barnes' complaints of knee pain in February 2022, and she stopped treating him in May 2023 when he transferred to a different institution.  During the fifteen months that Barnes was under Wachholz's care, she met with Barnes several times to discuss his pain and ordered specific treatments to address his complaints, including physical therapy, pain medication, lidocaine topical cream, an x-ray, and functional observation studies.  She also counseled him on his weight, ordered obesity labs, and explained ways he could lose weight to reduce the burden on his knee.  After injuring his knee at work, Barnes was provided a knee sleeve, ice, crutches, and four days off of work.  No jury could reasonably conclude that the totality of the care that Barnes received suggests that Wachholz was deliberately indifferent to his knee pain.

Barnes highlights that he had been experiencing knee pain for years, but he provides no evidence of the treatment he received before Wachholz began to treat him, nor does he provide evidence that Wachholz was aware of any previous treatments.  Accordingly, no jury could reasonably conclude that Wachholz's decision to start with conservative measures, such as physical therapy, lidocaine (which Barnes concedes was initially effective), and naproxen/acetaminophen demonstrated a persistence in treatments that she knew to be ineffective.  Nor is Wachholz liable for the alleged failures of previous providers to adequately respond to his complaints of pain.  *See Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996) (holding that §1983 requires that a defendant be personally involved in an alleged deprivation to be liable).

Barnes also asserts that Wachholz waited too long to order an x-ray and should have ordered an MRI, but Wachholz explains that she did not believe diagnostic tests were necessary because Barnes had reported no specific underlying injury and his complaints of mild, chronic pain

did not indicate a severe underlying condition. She also explains that, given Barnes' weight and poor hip/knee mechanics, she believed that exercise, weight loss, and physical therapy could effectively address his complaints of pain. As the Seventh Circuit has repeatedly explained, "[a]n MRI is simply a diagnostic tool, and the decision to [forgo] diagnostic tests is a classic example of a matter for medical judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Barnes has made clear that he wanted different care than Wachholz provided, but an inmate "is not entitled to demand specific care" and "disagreement over a course of treatment does not establish a constitutional violation." *Grant v. Heidorn*, 802 F. App'x 200, 205 (7th Cir. 2020) (citations omitted).

It is unfortunate that Barnes has had to endure years of knee pain, but chronic, nagging joint pain is common for many people, both inside and outside of prison. That is why the Seventh Circuit has observed that, "[t]o say the Eighth Amendment requires prison doctors to keep an inmate pain-free . . . would be absurd." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The record demonstrates that Wachholz made deliberate decisions to treat Barnes' complaints of knee pain in a particular manner. Accordingly, the Court must defer to her decisions "unless no minimally competent professional would have so responded under those circumstances." *Pyles*, 771 F.3d at 409. Because Barnes presents no evidence from which a jury could reasonably reach such a conclusion, Wachholz is entitled to summary judgment.

2. **No jury could reasonably conclude that Utter was deliberately indifferent to Barnes' knee pain.**

According to Barnes, Utter demonstrated deliberate indifference to his knee pain when she ignored the information request he addressed to her, in which he explained that medical staff was giving him the runaround and ignoring his complaints about his knee pain. But Utter never received the information request because, per policy, a nurse triaged the request and responded to

Barnes without forwarding the request to Utter.  Utter cannot have been deliberately indifferent to complaints she never knew about.  The record demonstrates that Utter's involvement was limited to her gathering information in response to the institution complaint examiner's questions about Barnes' inmate complaint.  Utter explains that, during her review of Barnes' file, she noted that Barnes had not been seen by the physical therapist despite having been referred several months earlier.  Utter notes that, at that time, there was about a six-month backlog for physical therapy because of staffing issues.  Still, in light of Barnes' complaints of pain, Utter called the physical therapist and asked him to schedule Barnes within two weeks.  She also confirmed that Barnes was scheduled to see his advanced care provider.  No jury could conclude from Utter's actions in response to a request for information that she was deliberately indifferent to Barnes' knee pain.  She is therefore entitled to summary judgment.

**IT IS THEREFORE ORDERED** that Defendants' summary judgment motion (Dkt. No. 41) is **GRANTED** and this action is **DISMISSED**.  The Clerk of Court shall enter judgment accordingly.

Dated at Milwaukee, Wisconsin on August 27, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.